# EXHIBIT A

FILED
10/15/2021 7:53 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L010149

FILED DATE: 10/15/2021 7:53 AM   2021L010149

| | | |
|---|---|---|
| **2120 - Served** | **2121 - Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties
 MICHAEL GOULD

_____

                                                    Plaintiff(s)

                              v.

 TYLER CROOKSTON          Case No. ___2021 L_____

_____

 TYLER CROOKSTON          Defendant(s)
 3321 N Kenmore Ave
 # 1
 Chicago, IL 606571

                        Address of Defendant(s)

Please serve as follows (check one):  ○ Certified Mail  ○ Sheriff Service  ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE**. You will need: a computer with internet access; an email address; a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**            **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE:** **Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERK'S OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

10/15/2021 7:53 AM IRIS Y. MARTINEZ

○ Atty. No.: 64600

○ Pro Se 99500

      Alex Loftus

Name:

Atty. for (if applicable):

Michael Gould

Address: 161 N. Clark St., Ste. 1600

City: Chicago

State: IL    Zip: 60601

Telephone: (312) 899-6625

Primary Email: alex@loftusandeisenberg.com

Witness date _____

_____

IRIS Y. MARTINEZ, Clerk of Court

☐ Service by Certified Mail: _____

☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 10/15/2021 7:53 AM 2021L010149

FILED DATE: 10/15/2021 7:53 AM   2021L010149

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:**  CivCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:**  CntyCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:**  DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:**  DVCourtDate@cookcountycourt.com
Gen. Info:   (312) 325-9500

### LAW DIVISION
**Court date EMAIL:**  LawCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:**  ProbCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:**  D2CourtDate@cookcountycourt.com
Gen. Info:   (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:**  D3CourtDate@cookcountycourt.com
Gen. Info:   (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:**  D4CourtDate@cookcountycourt.com
Gen. Info:   (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:**  D5CourtDate@cookcountycourt.com
Gen. Info:   (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:**  D6CourtDate@cookcountycourt.com
Gen. Info:   (708) 232-4551

FILED DATE: 10/15/2021 7:53 AM  2021L010149

FILED
10/15/2021 7:53 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L010149

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MICHAEL GOULD | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2021 L |
| TYLER CROOKSTON, | ) | |
| Defendant. | ) | |
| | ) | JURY DEMANDED |

## VERIFIED COMPLAINT

Plaintiff, MICHAEL GOULD, by and through his undersigned attorneys, LOFTUS & EISENBERG, LTD. and for his Complaint against Defendant, TYLER CROOKSTON ("Defendant"), states as follows:

### I.     INTRODUCTION

1.     JJMT Capital, LLC ("JJMT") served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. JJMT's members Joseph DeAlteris ("DeAlteris"), Matthew Schweinzger ("Schweinzger"), Jacob Wunderlin ("Wunderlin"), and Tyler Crookston ("Crookston") were fiduciaries for investors who invested in 1inMM.

2.     Horwitz's scheme was absurd and it wouldn't have been funded but for sophisticated placement agents – including Defendant – parroting his lies, cloaking the scheme in their own credibility as brokers and investment bankers for large Wall Street firms, and selling the offering to their closest friends.

3.     Defendant acted as a broker for investment in 1inMM and owed well defined duties in that role to do some investigation into the investment before offering it. Instead, Defendant operated in willful ignorance and never sought any third-party confirmation of Horwitz's stories.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

4.      Defendant, as a broker and Chartered Financial Analyst ("CFA"), was the gatekeeper of any information.

5.      Had Crookston notified Plaintiff of his concerns when he left JJMT, called HBO or Netflix, obtained 1inMM bank records, or ordered an audit, as required by controlling regulations, before recommending this investment, all of this would have been prevented and Plaintiff would not have even been presented with this "opportunity."

## II.    PARTIES

6.      Plaintiff, Michael Gould, is and at all times relevant to this action, has been a citizen of the state of Illinois and domiciled in Illinois.

7.      Defendant, Tyler Crookston ("Crookston"), is and at all times relevant to this action, has been a citizen of the state of Illinois and domiciled in Illinois.

8.      Crookston was all times relevant hereto a member and control person of JJMT Capital, LLC ("JJMT").

9.      Crookston personally introduced Gould to the investment and handled all of his investments with 1inMM until he left JJMT.

## III.   JURISDICTION AND VENUE

10.     Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over Defendant because Defendant committed the tortious acts complained of in Cook County, Illinois.

11.     Venue in this county is proper pursuant to 735 ILCS 5/2-101, because the acts and omissions complained of occurred in this county. Defendant purposely availed himself of jurisdiction in Cook County by selling securities to Cook County residents, directing phone, email, and letter correspondence to investors in Cook County, meeting with investors in Cook County and making oral misrepresentations here.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

12.     The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not removable to federal court under the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 77p(f)(3), nor is it subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

### IV.     FACTS COMMON TO ALL COUNTS

#### A.  Horwitz's Obvious Ponzi Scheme

13.     Zachary Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted a Ponzi scheme raising over $690 million from investors through several de facto placement agents including JJMT using fabricated agreements and fake emails with prominent third-party companies with whom Horwitz had no actual business relationship.

14.     Horwitz told Defendant directly and through his JJMT partners that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

15.     Horwitz told Defendant he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

16.     In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

17.     On September 1, 2021, Horwitz pled guilty to securities fraud and detailed the scheme in the Plea Agreement attached hereto as Exhibit "A" and incorporated herein.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

18.     Horwitz obtained funds from JJMT and other firms acting as placement agents via promissory notes which were funded by notes issued to individual investors.

19.     Horwitz relied on Defendant and his network of wealthy friends to act as his brokers or investment bankers to raise funds and serve as a gatekeeper of his lies delivered to retail investors.

20.     The promissory notes issued by 1inMM to the de facto placement agents including JJMT had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

21.     Horwitz told Defendant that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

22.     Horwitz told Defendant he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

23.     Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

24.     The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from

4

FILED DATE: 10/15/2021 7:53 AM    2021L010149

Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

25.     Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.

26.     Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

27.     To support his false representations, Horwitz sent forged documents to JJMT that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

28.     Horwitz's representations were false and the documents he sent to JJMT were fabricated.

29.     These falsehoods could have easily been confirmed prior to any investment by Plaintiff with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and JJMT had reaped millions in "commissions."

30.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the promissory notes and did not sell those rights to Netflix or HBO.

31.     Horwitz used money "invested" in his "company" for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments

FILED DATE: 10/15/2021 7:53 AM 2021L010149

for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

32.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

33.     Horwitz provided JJMT false explanations by text message and email for why he had stopped making payments.

34.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

35.     Horwitz told JJMT that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM

36.     Throughout 2020, Horwitz lulled JJMT, with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

**B. JJMT's Ignorant Participation in the Scheme**

37.     Horwitz raised money with five principal firms who acted as placement agents selling notes for investment, including JJMT, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

38.     JJMT relied on personal relationships and word-of-mouth referrals to obtain investors.

39.     JJMT typically solicited investors in person, over the telephone, and via email for the 1inMM Offering.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

40.     JJMT solicited nearly $500,000,000 in investment via promissory notes in the 1inMM Offering of which $120,000,000 remains outstanding.

41.     In or about March of 2014, Horwitz first presented his Indiana University buddy Wunderlin, with an investment opportunity in 1inMM, whereby Wunderlin would lend funds in exchange for a promissory note, and the funds would serve to finance and facilitate the licensing of specific media content to a streaming platform.

42.     Horwitz made representations regarding 1inMM to Wunderlin regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

43.     Crookston negligently relied only on representations from Horwitz and those parroted by his JJMT partners when recommending the investment to Plaintiff rather than confirming anything with third parties.

44.     In or about July of 2015, JJMT was created by DeAlteris, Schweinzger, Wunderlin, and Crookston for the sole purpose of selling investment into 1inMM.

45.     In or about November of 2015, the JJMT members began to utilize JJMT as the placement agent for 1inMM. The capital deployed by JJMT was provided by Plaintiff.

46.     During this time, Horwitz made representations and provided purported contracts, emails, and other information to the JJMT members, which JJMT negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

47.     Defendant proceeded to sell Plaintiff promissory notes for the 1inMM Offering by regurgitating the lies told by Horwitz.

48.     Defendant acted as the gatekeeper of information from Horwitz and as fiduciaries to Plaintiff.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

49.     In a December 16, 2019 email, Wunderlin told investors that he had never even seen bank statements or any indication of payment actually received by Netflix or HBO, stating:

> We are trying to use this opportunity [the defaults] to dig in with further diligence and pry open some of the sensitive information 1inMM has historically held close. For example, bank statements... letting JJMT create a model going forward for cash flow management... with the ultimate goal of becoming a partner in a CFO type role where 1inMM is an open book (long way to go to get there... but trying to leverage 1inMM's misstep into something positive)

50.     Rather than relying on any substantive investigation of its own, Defendant relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate.

51.     Defendant did not bother to do his own independent due diligence when promoting the Ponzi Scheme as a suitable investment to Plaintiff.

52.     Horwitz peppered Defendant with hundreds of bogus documents supporting his scheme.

53.     Defendant relied exclusively on Horwitz's own due diligence of himself and 1inMM rather than doing his own investigation.

54.     Defendant kept his head in the sand so long as the lulling payments kept coming in from 1inMM.

55.     Upon information and belief, Crookston was aware of the fraudulent scheme conducted by Horwitz and left JJMT shortly before the defaults, citing his partners' excessive risk taking as the reason for his departure.

56.     From in or about mid 2015 until late 2019, JJMT's financing of 1inMM's content licensing transactions continued to grow. During this time, JJMT provided financing to 1inMM in exchange for promissory notes with total principal value of approximately $485 million.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

57.     The amount repaid by 1inMM to JJMT during this period for these promissory notes, inclusive of specified interest, was approximately $440 million, some of which was redeployed by noteholders for future loans.

**C. Crookston's Duty to Plaintiffs**

58.     The 1inMM Offerings were structured as follows: JJMT lent money to 1inMM for defined projects, JJMT funded the loan to 1inMM via a promissory note from Plaintiff, JJMT charged 1inMM 35% interest on the notes and paid investors 20% interest on the notes, leaving a 15% "commission" for JJMT for placing the investment.

59.     For all intents and purposes, JJMT was acting as a placement agent for 1inMM and was paid a 15% commission on the sales.

60.     Defendant owed Plaintiff fiduciary duties as an investment advisor and Crookston admitted this fiduciary duty in an email. (Exhibit "B", January 10, 2018 email from Crookston, "I am still personally heavily invested with JJMT thru December 2018 and will be on the look out for your best interests/monitor our fiduciary responsibilities.")

61.     Crookston was a Chartered Financial Analyst ("CFA") at all times relevant to this Complaint and held himself out as such when dealing with Plaintiffs.

62.     Crookston had an "advisory relationship" with Plaintiff when recommending he invest in 1inMM and held himself out as a CFA in every email he sent from his JJMT account.

63.     As a CFA, Crookston owed Plaintiff well-defined duties as set out in the CFA Institute's Code of Ethics and Professional Conduct attached hereto as Exhibit "C" and incorporated herein.

64.     Crookston owed Plaintiff a duty to investigate the investment rather than take the hucksters word for it, the duty is defined as follows:

FILED DATE: 10/15/2021 7:53 AM   2021L010149

Members and Candidates must: 1. Exercise diligence, independence, and thoroughness in analyzing investments, making investment recommendations, and taking investment actions. 2. Have a reasonable and adequate basis, **supported by appropriate research and investigation**, for any investment analysis, recommendation, or action

(emphasis added)

65.     Placement agents such as Crookston who sell private placements to retail customers for a commission, as Crookston did here, are required to register with the Financial Industry Regulatory Authority ("FINRA").

66.     FINRA regulates broker/dealer firms like JJMT and Crookston and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

67.     Crookston was formerly a registered broker prior to forming JJMT.

68.     While JJMT was not a licensed broker-dealer, it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission.

69.     As a placement agent, or at least a party acting in that role, Crookston was required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

70.     SEC Regulation Best Interest ("Reg BI") provides that Crookston, as a placement agent, owed the following duties to Plaintiffs:

(ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:
(A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;
(B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's**

FILED DATE: 10/15/2021 7:53 AM    2021L010149

**investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;

(C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(1).)

71.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a.     the issuer and its management;

b.     the business prospects of the issuer;

c.     the assets held by or to be acquired by the issuer;

d.     the claims being made; and

e.     the intended use of proceeds of the offering.

72.     Crookston had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

73.     FINRA has also provided detailed guidance on how a broker-dealer such as JJMT Crookston was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

74.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM and its history by Crookston would have included:

FILED DATE: 10/15/2021 7:53 AM    2021L010149

a.      Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.      Looking for any trends indicated by 1inMM's financial statements;

c.      Contacting customers and suppliers regarding their dealings with 1inMM;

d.      Reviewing 1inMM's contracts, leases, and financing arrangements;

e.      Inquiring about 1inMM's past securities offerings and the degree of their success;

f.      Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

75.     This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer himself. There was zero independent investigation done by Crookston or his compatriots at JJMT.

76.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's business prospects by JJMT should include:

a.      Inquiring about the viability and value of any movies funded by 1inMM;

b.      Inquiring about the industry in which 1inMM operates, and the competitive position of 1inMM; and

c.      Requesting any business plan, business model or other description of the business intentions of 1inMM and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

FILED DATE: 10/15/2021 7:53 AM 2021L010149

77.     This was not done here. The contracts were fictitious. Neither Crookston nor his colleagues at JJMT engaged HBO or Netflix independent of Horwitz.

78.     Minimal investigation would have confirmed the purported counsel at Netflix was not even working at Netflix at the time of the supposed emails or that HBO had no record of 1inMM.

79.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's assets and facilities should include:

a.      Carefully examining any reports by third-party experts that may raise red flags;

b.      Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

c.      Inquiring about previous or potential regulatory or disciplinary problems of the issuer.

d.      Obtaining a credit check of 1inMM.

e.      Making reasonable inquiries concerning the issuer's management. Crookston should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change.

f.      Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

FILED DATE: 10/15/2021 7:53 AM   2021L010149

g.     Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

80.     Crookston failed to do this third-party confirmation of this supposedly $600,000,000 operation.

81.     A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

82.     FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

83.     Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

84.     Crookston could not rely blindly upon the issuer for information concerning a company, nor may he rely on the information provided by the issuer in lieu of conducting his own reasonable investigation.

85.     While broker-dealers like JJMT are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

86.     Of course, under these circumstances, Defendant was in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since he was acting as its placement agent or investment banker raising capital exclusively for 1inMM.

87.     As the de facto placement agent and investment banker for 1inMM, JJMT was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

88.     In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

89.     As described below, unfortunately for Plaintiff, Crookston failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that he owed Plaintiff.

**D. 1inMM Defaults**

90.     Between 2015 and 2019, JJMT never missed a payment to investors and lowered the rates of return on notes from 35% to 25%.

91.     In January 2018, Crookston emailed one investor, noting his title of Chartered Financial Analyst:

FILED DATE: 10/15/2021 7:53 AM   2021L010149

I wanted to shoot you a note to let you know that going forward I will be taking a reduced role within JJMT Capital and that Jake Wunderlin will be your point person for reinvestment, repayment, upcoming deal flow, etc.

In no way does this change your current investment risk or payback period but I just wanted to alert you that I will be slowly reducing my role as a partner within the firm. I will still be on most communication, will still be available for any questions and will still be involved but it will be in a heavily reduced role going forward.

I am still personally heavily invested with JJMT thru December 2018 and will be on the look out for your best interests/monitor our fiduciary responsibilities but myself and the other partners felt it was best to slowly wind down my involvement.

I wanted to let you know as soon as possible of this new development – as I said it shouldn't substantially change your investment risks, etc  - but if you want to talk further about why I am leaving JJMT I can make myself available for a phone call at anytime or would love to catch up over a drink.

Thanks,
Tyler

--

--
**Tyler Crookston, CFA**

(Exhibit "B").

      92.     In December 2018, Crookston suspiciously left JJMT right before the payments

stopped flowing. He sent the following text message in 2021 providing a different explanation for

his departure to another investor about how his partners "looked at risk":

FILED DATE: 10/15/2021 7:53 AM    2021L010149



93.     Upon information and belief, when Crookston left JJMT he received in excess of $4,000,000 severance and has held onto this money knowing that it was ill-gotten.

94.     Crookston's over $4,000,000 payout is a greater return than anyone else in the scheme realized. The others involved in the Ponzi Scheme including Horwitz were left holding the bag when the stream of new investors ran out and realized little profits. Crookston's departure was perfectly timed and he's the big winner in this whole fraudulent scheme.

95.     Crookston did not warn Plaintiff about how his colleague's "looked at risk" and instead lulled him into thinking all was well and to continue investing in the Ponzi Scheme he was personally afraid of.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

96.     In late February 2021, JJMT informed investors that JJMT had retained new counsel at King & Spalding in Los Angeles to determine validity of 1inMM and to pursue litigation.

97.     Obviously, the time to determine the validity of 1inMM with the help of competent counsel was before selling nearly $400,000,000 in investment into it.

98.     On February 28, 2021, JJMT called several investors to tell them that **<u>after just one day of investigating,</u>** new counsel at King & Spalding discovered Horwitz's fraud and Ponzi Scheme.

99.     On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation.

100.    Plaintiff justifiably relied on Crookston's representations about the suitability of investment in 1inMM because he and the JJMT principals had worked for blue chip private equity firms investigating investments at the very highest levels and Crookston was a broker and CFA.

101.    Plaintiff relied on Crookston to investigate the investment he was offering and confirm facts presented in the offering materials.

102.    Plaintiff justifiably relied on Crookston's statements about the investment and that JJMT had a reasonable basis for recommending the investment.

103.    Plaintiff continued to renew his investments after Crookston left JJMT based on his earlier recommendation and his assurance that he left JJMT for reasons independent of the suitability of the 1inMM Offering.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

### E.  Gould's Investment in JJMT

104.    Gould was first sold on the 1inMM Offering in the fall of 2016 by Crookston and made another in  investment with Crookston of $95,000, which was re-paid as agreed in May 2018 with 25% interest.

105.    Gould went on to make several investments with Crookston in JJMT in 2018 that were repaid as promised.

106.    When Crookston left JJMT in January 2019, Gould relied on Crookston's representation that all would continue the same and continued to make investments based on Gould's original due diligence of 1inMM.

107.    Had Crookston told Gould he left because he was concerned about his partners risk taking or the basis for his concerns about risk-taking, Gould would not have continued to invest in JJMT.

108.    On April 22, 2019, Gould executed a promissory note as part of the 1inMM Offering agreeing to invest $62,655.00.

109.    On June 13, 2019, Gould executed a promissory note as part of the 1inMM Offering agreeing to invest $125,000.00.

110.    On August 29, 2019, Gould executed a promissory note as part of the 1inMM Offering agreeing to invest $125,000.00.

111.    On August 29, 2019, Gould executed a promissory note as part of the 1inMM Offering agreeing to invest $112,000.00.

112.    To date, Gould is owed over $424,655 from JJMT.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

V.    **CLAIMS**

**COUNT I**
**Breach of Fiduciary Duty**

113.    Plaintiff restates and realleges paragraphs 1 through 112 as though fully set forth herein as paragraph 113.

114.    Crookston had superior knowledge, expertise, and skills in investing, which were skills Plaintiff did not have.

115.    Plaintiff reposed complete trust and confidence in Crookston that he would act in Plaintiff's best interests.

116.    Through that trust and confidence, and his licensing as a broker and Chartered Financial Analyst, Defendant gained influence and superiority over Plaintiff relative to his investments.

117.    Crookston owed fiduciary duties to Plaintiff including the duties of utmost loyalty, good faith, full and fair disclosures, and the duty to:

a) Provide investment advice that is in Plaintiff's best interest;
b) Refrain from engaging in activities that conflict with Plaintiff's interests;
c) Concealing his own reasons for leaving JJMT;
d) Make full and frank disclosure of his conflicts of interest, to the extent such conflicts cannot be avoided; and
e) Investigate 1inMM fully prior to recommending any investment in it.

118.    Defendant breached the fiduciary duties he owed to the Plaintiff by:

a) Negligently misrepresenting the nature of the investments;
b) Negligently misrepresenting the value of the investments;
c) Failing to investigate the investment as required of professionals recommending investments;
d) Concealing his own concerns about his partners' risk taking;
e) Concealing Horwitz's misrepresentations; and
f) Other breaches of fiduciary duties detailed herein.

119.    Defendant's breach of his fiduciary duties caused injuries to Plaintiff.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

120.    Defendant unjustly profited from his breaches of duty with a huge severance payment when he left JJMT.

121.    As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages, which consist of investment losses caused by Defendant's breach, recovery of monies paid to them and the entities under his control and lost interest.

122.    As a direct and proximate result of Defendant's breaches of fiduciary duty as detailed herein, Plaintiff has been damaged in an amount to be proven at trial in excess of $500,000.

WHEREFORE, Plaintiff MICHAEL GOULD, respectfully requests that this Court enter judgment in his favor and against Defendant, TYLER CROOKSTON, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

## COUNT II
### Negligent Misrepresentation

123.    Plaintiff restates and realleges paragraphs 1 through 112 as though fully set forth herein as paragraph 123.

124.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Crookston are the rules promulgated by FINRA, which each broker offering securities such as the 1inMM notes should be a member of, and the CFA Institute Code of Ethics.

125.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

126.    Defendant owed Plaintiff a duty to act as a reasonably prudent broker-dealer or CFA would do under the same or similar circumstances. The duties set forth herein arise from the

FILED DATE: 10/15/2021 7:53 AM    2021L010149

regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff as a result of the client relationship between Crookston and Plaintiff.

127.    As set forth above, Defendant breached his legal duty to provide accurate information to Plaintiff as holder of investments in JJMT by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    By reason of the aforesaid, Defendant is guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in 1inMM Offerings.

129.    At all times relevant to this action, Defendant had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Defendant made material omissions of fact with respect to the offer and sale of securities.

130.    As described above, Defendant negligently breached his duties to Plaintiff.

131.    Had a reasonably prudent financial professional under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

132.    By approving of the sale of the 1inMM Offerings to his clients, notwithstanding the numerous red flags identified herein, Crookston demonstrated that he failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure he maximized his placement agent fees and commissions.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

133.    Crookston further breached his duty when he left JJMT by failing to inform Plaintiff of his fears of his partner's risk taking and instead recommended Plaintiff continue investing in the scheme.

134.    Crookston knew or should have known that Plaintiff would place his trust and confidence in him that he had a reasonable-basis to conclude that 1inMM was suitable for at least some investors, and that he had conducted adequate due diligence to understand the risks and rewards of the 1inMM offering, and that if he learned something that would give him cause to leave he would have shared these facts as required pursuant to applicable standards.

135.    Crookston knew or should have known that it was reasonably foreseeable that Plaintiff would act in reliance on his and JJMT's approval to sell the 1inMM Offerings.

136.    Plaintiff made his initial investment and continued investing after Crookston left JJMT in reliance on Crookston's approval to offer to sell the 1inMM offerings and his continued assurances when he left JJMT.

137.    But for Crookston's approval to sell the 1inMM Offerings, Plaintiff would not have even been presented the opportunity to participate in the 1inMM Offerings.

138.    As a direct and proximate result of Crookston's negligence, 1inMM is liable to Plaintiff for all of the investment losses that he suffered in 1inMM.

WHEREFORE, Plaintiff, MICHAEL GOULD, respectfully requests that this Court enter judgment in his favor and against Defendant, TYLER CROOKSTON, in an amount in excess of $500,000 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

FILED DATE: 10/15/2021 7:53 AM    2021L010149

## COUNT III
### Unjust Enrichment

139.     Plaintiff restates and realleges paragraphs 1 through 112 as though fully set forth herein as paragraph 139.

140.     Crookston received and retained a benefit from Plaintiff and inequity has resulted.

141.     Crookston benefitted from negligently misrepresenting the nature and value of the Plaintiff investment and Horwitz's gross fraud.

142.     Crookston directly benefitted by earning over $4,000,000 as a result of Horwitz's admitted criminal conduct.

143.     Plaintiff conferred a benefit on Crookston by paying excessive interest on fraudulent investments.

144.     It is inequitable for Crookston to retain these benefits.

145.     Plaintiff was not aware of the true facts about the investment, and did not benefit from Crookston's conduct.

146.     Crookston knowingly accepted the benefits of his unjust conduct and refused to return the benefit when the fraud was admitted.

147.     As a result of Defendant's conduct, the amount of his unjust enrichment should be disgorged in an amount according to proof.

FILED DATE: 10/15/2021 7:53 AM   2021L010149

WHEREFORE, Plaintiff, MICHAEL GOULD, respectfully requests that this Court enter judgment in his favor and against Defendant, TYLER CROOKSTON, in an amount in excess of $500,000 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

Respectfully Submitted,
MICHAEL GOULD
Plaintiff

By: /s/ *Alexander N. Loftus*
One of Plaintiff's Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: 312.899.6625
c: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

Firm No: 64600

Dated: October 15, 2021

## VERIFICATION

Under penalties as provided by law pursuant to Section 5/1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies that the statements set forth in the **VERIFIED COMPLAINT** are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

By: /s/*Michael Gould*
**MICHAEL GOULD**

FILED DATE: 10/15/2021 7:53 AM   2021L010149

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| MICHAEL GOULD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2021 L |
| | ) | |
| TYLER CROOKSTON, | ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT "A"

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
DAVID H. CHAO (Cal. Bar No. 273953)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259/4586
    Facsimile: (213) 894-0141
    E-mail:    alexander.schwab@usdoj.gov
              david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-214-MCS |
|     Plaintiff, | PLEA AGREEMENT FOR DEFENDANT ZACHARY JOSEPH HORWITZ |
|         v. | |
| ZACHARY JOSEPH HORWITZ, | |
|     Defendant. | |

1.    This constitutes the plea agreement between ZACHARY JOSEPH HORWITZ ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

    a.    At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the

FILED DATE: 10/15/2021 7:53 AM  2021L010149

1  indictment in <u>United States v. Zachary Joseph Horwitz</u>, CR No. 21-214-

2  MCS, which charges defendant with securities fraud, in violation of

3  15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

4        b.   Not contest facts agreed to in this agreement.

5        c.   Abide by all agreements regarding sentencing contained

6  in this agreement.

7        d.   Appear for all court appearances, surrender as ordered

8  for service of sentence, obey all conditions of any bond, and obey

9  any other ongoing court order in this matter.

10       e.   Not commit any crime; however, offenses that would be

11 excluded for sentencing purposes under United States Sentencing

12 Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

13 within the scope of this agreement.

14       f.   Be truthful at all times with the United States

15 Probation and Pretrial Services Office and the Court.

16       g.   Pay the applicable special assessment at or before the

17 time of sentencing unless defendant has demonstrated a lack of

18 ability to pay such assessments.

19       h.   Defendant agrees that any and all criminal debt

20 ordered by the Court will be due in full and immediately.  The

21 government is not precluded from pursuing, in excess of any payment

22 schedule set by the Court, any and all available remedies by which to

23 satisfy defendant's payment of the full financial obligation,

24 including referral to the Treasury Offset Program.

25       i.   Complete the Financial Disclosure Statement on a form

26 provided by the USAO and, within 30 days of defendant's entry of a

27 guilty plea, deliver the signed and dated statement, along with all

28 of the documents requested therein, to the USAO by either email at

                                 2

usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012. Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j. Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k. Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

l. Agree that all court appearances, including his change of plea hearing and sentencing hearing, may proceed by video-teleconference ("VTC"), so long as such appearances are authorized by Order of the Chief Judge 20-097 or another order, rule, or statute. Defendant understands that, under the Constitution, the United States Code, the Federal Rules of Criminal Procedure (including Rules 11, 32, and 43), he may have the right to be physically present at these hearings. Defendant understands that right and, after consulting with counsel, voluntarily agrees to waive it and to proceed remotely. Defense counsel also joins in this consent, agreement, and waiver. Specifically, this agreement includes, but is not limited to, the following:

i. Defendant consents under Section 15002(b) of the CARES Act to proceed with his change of plea hearing by VTC.

ii. Defendant consents under Section 15002(b) of the CARES Act to proceed with his sentencing hearing by VTC if personal appearance is deemed by the Court to be unsafe due to COVID-19

3

concerns.  The parties agree to use best efforts to conduct the
sentencing hearing in person with the Court's approval.

         iii. Defendant consents under 18 U.S.C. § 3148 and
Section 15002(b) of the CARES Act to proceed with any hearing
regarding alleged violations of the conditions of pretrial release by
VTC or telephone, if VTC is not reasonably available.

THE USAO'S OBLIGATIONS

3.   The USAO agrees to:

    a.   Not contest facts agreed to in this agreement.

    b.   Abide by all agreements regarding sentencing contained
in this agreement.

    c.   At the time of sentencing, move to dismiss the
remaining counts of the indictment as against defendant.  Defendant
agrees, however, that at the time of sentencing the Court may
consider any dismissed charges in determining the applicable
Sentencing Guidelines range, the propriety and extent of any
departure from that range, and the sentence to be imposed.

    d.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offense up to
and including the time of sentencing, recommend a two-level reduction
in the applicable Sentencing Guidelines offense level, pursuant to
USSG § 3E1.1, and recommend and, if necessary, move for an additional
one-level reduction if available under that section.

NATURE OF THE OFFENSE

4.   Defendant understands that for defendant to be guilty of
the crime charged in count one, that is, securities fraud, in
violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, the
following must be true:

4

FILED DATE: 10/15/2021 7:53 AM 2021L010149

(1) defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statements misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2) defendant's acts were undertaken, statement was made, or failure to disclose was done in connection with the purchase and sale of securities within the meaning of 15 U.S.C. § 78c(a)(10);

(3) defendant directly or indirectly used wire communications in connection with these acts, making this statement, or this failure to disclose; and

(4) defendant acted knowingly.

"Willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone. Acting willfully does not require that the defendant know that the conduct was unlawful.

A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making the decision to purchase securities.

It is not necessary that an untrue statement passed through or over the wire communications so long as the wire communications were used as a part of the transaction.

It is not necessary that defendant made a profit or that anyone actually suffered a loss.

<u>PENALTIES AND RESTITUTION</u>

5.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 15 U.S.C. §§ 78j(b),

5

FILED DATE: 10/15/2021 7:53 AM    2021L010149

78ff and 17 C.F.R. § 240.10b-5 is: twenty years of imprisonment; a three-year period of supervised release; a fine of $5 million or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6. Defendant understands that defendant will be required to pay full restitution to the victims of the offense to which defendant is pleading guilty and agrees to make such restitution. Defendant understands and agrees that although a violation of 18 U.S.C. § 1343 does not constitute the count of conviction in this plea agreement, this plea agreement relates to such a charge, which is an offense against property, within the meaning of 18 U.S.C. § 3663A(c)(2), thereby bringing this offense within the ambit of 18 U.S.C. § 3663A. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty, and in amounts greater than those alleged in the count to which defendant is pleading guilty, so long as such persons qualify as "victims," within the meaning of 18 U.S.C. § 3663A(a)(2), of defendant's offense and/or relevant conduct. In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed pursuant to this agreement as well as all relevant conduct, as defined in USSG § 1B1.3, in connection with those counts. Defendant understands that the Court may impose, and the USAO reserves the right to seek, restitution on any basis permitted by law.

7. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9. Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States. Defendant may also be denied United States citizenship and admission to the United States in the future.

7

FILED DATE: 10/15/2021 7:53 AM 2021L010149

Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case. Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

<u>FACTUAL BASIS</u>

10. Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty. Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

In or about 2013, defendant founded 1inMM Capital, LLC ("1inMM Capital"), which defendant promoted as a film distribution company. 1inMM Capital's principal place of business was in Los Angeles, California.

Beginning no later than in or about March 2014, and continuing through at least on or about April 6, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and willfully, by the use of the means and

FILED DATE: 10/15/2021 7:53 AM    2021L010149

1  instrumentalities of interstate commerce, in connection with the

2  purchase and sale of securities, used and employed manipulative and

3  deceptive devices and contrivances, in violation of Title 15, United

4  States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal

5  Regulations, Section 240.10b-5, by: (1) employing a scheme to

6  defraud; (2) making untrue statements of material facts and omitting

7  to state material facts necessary in order to make the statements

8  made, in light of the circumstances under which they were made, not

9  misleading; and (3) engaging in acts, practices, and courses of

10  business which operated and would operate as a fraud and deceit upon

11  purchasers of securities (the "investors"). Defendant did so by

12  making and causing to be made materially false and fraudulent

13  statements and material omissions to the investors about defendant

14  and 1inMM Capital's use of their investments.

15      In execution of the fraudulent scheme, defendant made offers to

16  investors to purchase promissory notes issued by 1inMM Capital, which

17  notes constituted "securities" within the meaning of the Securities

18  Exchange Act of 1934, by making a series of false and misleading

19  statements and by using various deceptive contrivances. Each of

20  these statements and contrivances was material to investors.

21  Specifically, defendant falsely represented to investors that 1inMM

22  Capital would purchase distribution rights to certain films, which

23  defendant falsely claimed 1inMM Capital would then profitably license

24  to online streaming platforms such as HBO and Netflix for further

25  distribution in regions outside the United States. To raise funds

26  for 1inMM Capital's purported business activities, defendant

27  solicited investments from the investors by offering to sell them

28  promissory notes issued by 1inMM Capital and signed by defendant.

1  The promissory notes guaranteed a specified payment on a specified

2  maturity date, typically six or twelve months in the future.  Each

3  note listed the principal amount of money borrowed, which typically

4  ranged from approximately $35,000 to $1.5 million, as well as the

5  specified amount to be paid at maturity, a calculated return that

6  ranged from 25 to 45 percent.

7       In connection with the sale of these promissory notes, defendant

8  falsely represented that 1inMM Capital would use the principal amount

9  of money invested pursuant to each note to purchase distribution

10  rights for the film(s) specified as collateral for the note.

11  Defendant also falsely represented that 1inMM Capital would satisfy

12  its obligations under each note through the profits that 1inMM

13  Capital would obtain by acquiring and licensing the distribution

14  rights to the film(s) specified in each note.  Each note contained an

15  assignment of rights provision that listed the specific film(s) that

16  would serve as collateral for the note.  The assignment of rights

17  provision in each note contained express representations and

18  warranties that 1inMM Capital was the sole and exclusive owner of the

19  rights to the listed film(s).  However, as defendant then knew, his

20  representations concerning 1inMM Capital's business activities and

21  the promissory notes themselves were false and deceptive because

22  1inMM Capital generally did not and would not acquire or possess the

23  film distribution rights for the films specified as collateral in the

24  promissory notes, and 1inMM Capital did not and would not enter into

25  any distribution agreements with the online streaming platforms for

26  these specified films.

27       In furtherance of the scheme, defendant also provided investors

28  with fraudulent copies of purported license agreements between 1inMM

FILED DATE: 10/15/2021 7:53 AM    2021L010149

Capital and the sales agents for the production companies of the films identified in the promissory notes. In fact, as defendant then knew, these license agreements were fake because 1inMM Capital had not acquired the film distribution rights that constituted the purported collateral for the promissory notes and had not entered into the asserted license agreements with the identified sales agents.

In furtherance of the scheme, defendant also falsely represented to investors that online streaming platforms had already entered or committed to enter into distribution agreements with 1inMM Capital. Defendant provided investors with copies of these purported distribution agreements when, in fact, as defendant knew, 1inMM Capital had not entered into the asserted distribution agreements with the online streaming platforms and the purported copies of the distribution agreements were fake.

In furtherance of the scheme and to lull the investors into believing their funds were safely invested as he had promised, defendant falsely reassured investors that any missed payments on promissory notes were caused by the actions of the online streaming platforms, and that payment on the notes would resume. To support these false claims, defendant sent the investors emails and text messages regarding progress addressing the actions purportedly causing the missed payments and the resumption of payments, which defendant claimed had been sent to him by representatives of the online streaming platforms. In fact, as defendant then knew, he had not been in communication with the online streaming platforms, and the correspondence he was supposedly forwarding was fake.

FILED DATE: 10/15/2021 7:53 AM 2021L010149

1    Through the fraudulent scheme, defendant sold hundreds of
2  promissory notes issued by 1inMM Capital and thereby fraudulently
3  obtained at least $650 million from at least five major groups of
4  private investors.  Defendant understood that these investor groups
5  derived their investments, in part, from various sub-investors who
6  did not have direct contractual agreements with 1inMM Capital, and in
7  fact there were more than 250 such sub-investors (subject to the
8  reservation of rights in paragraph 12 below).  Defendant did not use
9  the invested money as promised but instead used the money to make
10  payments to prior investors, maintain 1inMM Capital's facade of
11  legitimate operations, make disbursements to himself and entities he
12  controlled, and otherwise finance his own lavish lifestyle.
13  Beginning in or about December 2019, 1inMM Capital began defaulting
14  on all of its outstanding promissory notes.  Thus, to date,
15  defendant, through 1inMM Capital, is in default to investors on a
16  total outstanding principal amount of approximately $230.36 million,
17  and defendant's scheme has caused substantial financial hardship to
18  at least five investors.

19    For the purpose of executing the above-described scheme to
20  defraud, and in furtherance of the manipulative and deceptive devices
21  described above, defendant directly and indirectly caused the use of
22  instrumentalities of interstate commerce in connection with the
23  purchase and sale of securities.  For example, on or about December
24  14, 2018, defendant caused the interstate wire transfer of
25  approximately $1,425,500 from Investor 1, located in Illinois, to the
26  1inMM Capital Account, located in California, to purchase a
27  promissory note secured by the assignment of rights to the film
28  "Active Measures."

FILED DATE: 10/15/2021 7:53 AM    2021L010149

FILED DATE: 10/15/2021 7:53 AM 2021L010149

## SENTENCING FACTORS

11.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

12.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss of more than $150 million but not more than $250 million | +26 | USSG § 2B1.1(b)(1)(N) |
| Substantial Financial Hardship to 5 or more victims | +4 | USSG § 2B1.1(b)(2)(B) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(2)(10)(C) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  By way of example, but not limitation, the government reserves the right to argue that defendant's offense and relevant conduct resulted in substantial financial hardship to 25 or more victims, and defendant reserves the

FILED DATE: 10/15/2021 7:53 AM    2021L010149

1 right to contest the number of sub-investors of the victim investor

2 groups as referenced above at page 12.

3     13. Defendant understands that there is no agreement as to

4 defendant's criminal history or criminal history category.

5     14. Defendant and the USAO reserve the right to argue for a

6 sentence outside the sentencing range established by the Sentencing

7 Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

8 (a)(2), (a)(3), (a)(6), and (a)(7).

9 <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10     15. Defendant understands that by pleading guilty, defendant

11 gives up the following rights:

12     a. The right to persist in a plea of not guilty.

13     b. The right to a speedy and public trial by jury.

14     c. The right to be represented by counsel -- and if

15 necessary have the Court appoint counsel -- at trial. Defendant

16 understands, however, that, defendant retains the right to be

17 represented by counsel -- and if necessary have the Court appoint

18 counsel -- at every other stage of the proceeding.

19     d. The right to be presumed innocent and to have the

20 burden of proof placed on the government to prove defendant guilty

21 beyond a reasonable doubt.

22     e. The right to confront and cross-examine witnesses

23 against defendant.

24     f. The right to testify and to present evidence in

25 opposition to the charges, including the right to compel the

26 attendance of witnesses to testify.

27

28

FILED DATE: 10/15/2021 7:53 AM 2021L010149

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

16.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

17.    Defendant agrees that, provided the Court imposes a total term of imprisonment within the statutory maximum, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, so long as it is less than $235 million; (f) the term of probation or supervised release imposed by the Court, provided it is within the

1 statutory maximum; and (g) any of the following conditions of

2 probation or supervised release imposed by the Court: the conditions

3 set forth in Second Amended General Order 20-04 of this Court; the

4 drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and

5 3583(d); and the alcohol and drug use conditions authorized by 18

6 U.S.C. § 3563(b)(7).

7 18. The USAO agrees that, provided (a) all portions of the

8 sentence are at or below the statutory maximum specified above and

9 (b) the Court imposes a term of imprisonment of no less than 235

10 months' imprisonment, the USAO gives up its right to appeal any

11 portion of the sentence, with the exception that the USAO reserves

12 the right to appeal the amount of restitution ordered.

13 RESULT OF WITHDRAWAL OF GUILTY PLEA

14 19. Defendant agrees that if, after entering a guilty plea

15 pursuant to this agreement, defendant seeks to withdraw and succeeds

16 in withdrawing defendant's guilty plea on any basis other than a

17 claim and finding that entry into this plea agreement was

18 involuntary, then (a) the USAO will be relieved of all of its

19 obligations under this agreement; and (b) should the USAO choose to

20 pursue any charge that was either dismissed or not filed as a result

21 of this agreement, then (i) any applicable statute of limitations

22 will be tolled between the date of defendant's signing of this

23 agreement and the filing commencing any such action; and

24 (ii) defendant waives and gives up all defenses based on the statute

25 of limitations, any claim of pre-indictment delay, or any speedy

26 trial claim with respect to any such action, except to the extent

27 that such defenses existed as of the date of defendant's signing this

28 agreement.

16

FILED DATE: 10/15/2021 7:53 AM 2021L010149

RESULT OF VACATUR, REVERSAL, OR SET-ASIDE

20.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

EFFECTIVE DATE OF AGREEMENT

21.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

22.  Defendant agrees that if defendant, at any time after the effective date of the agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

23.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

FILED DATE: 10/15/2021 7:53 AM    2021L010149

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

24. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information

18

to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

26.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

27.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional

19

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3  <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

4      28.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10  TRACY L. WILKISON
    Acting United States Attorney

11

12  _____    9/1/2021

13  ALEXANDER B. SCHWAB            Date
    DAVID H. CHAO

14  Assistant United States Attorneys

15  _____    09/01/2021

16  ZACHARY JOSEPH HORWITZ        Date
    Defendant

17

18  _____    9.1.2021

19  ANTHONY PACHECO               Date
    RYAN S. HEDGES
    Attorneys for Defendant

20  ZACHARY JOSEPH HORWITZ

21

22

23

24

25

26

27

28

FILED DATE: 10/15/2021 7:53 AM  2021L010149

FILED DATE: 10/15/2021 7:53 AM   2021L010149

### CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     09/01/2021
ZACHARY JOSEPH HORWITZ               Date
Defendant

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am one of ZACHARY JOSEPH HORWITZ's attorneys. I have
carefully and thoroughly discussed every part of this agreement with
my client. Further, I have fully advised my client of his rights, of
possible pretrial motions that might be filed, of possible defenses
that might be asserted either prior to or at trial, of the sentencing
factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing
Guidelines provisions, and of the consequences of entering into this
agreement. To my knowledge: no promises, inducements, or
representations of any kind have been made to my client other than
those contained in this agreement; no one has threatened or forced my
client in any way to enter into this agreement; my client's decision
to enter into this agreement is informed and voluntary; and the
factual basis set forth in this agreement is sufficient to support my
client's entry of a guilty plea pursuant to this agreement.

_____     9·1·2021
ANTHONY PACHECO                      _____
RYAN S. HEDGES                       Date
Attorneys for Defendant
ZACHARY JOSEPH HORWITZ

22

FILED DATE: 10/15/2021 7:53 AM   2021L010149

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| MICHAEL GOULD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2021 L |
| | ) | |
| TYLER CROOKSTON, | ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT "B"

**Subject**: Fwd: JJMT Update
**From**: Michael Gould <mgould41@gmail.com>
**To**: alex@loftusandeisenberg.com
**Date Sent**: Wednesday, April 14, 2021 4:12:42 PM GMT-05:00
**Date Received**: Wednesday, April 14, 2021 4:12:54 PM GMT-05:00

---

---------- Forwarded message ---------
From: **Tyler Crookston** <tcrookston@jjmtcap.com>
Date: Wed, Jan 10, 2018 at 7:17 PM
Subject: JJMT Update
To: Michael Gould <mgould41@gmail.com>

MPG,

I wanted to shoot you a note to let you know that going forward I will be taking a reduced role within JJMT Capital and that Jake Wunderlin will be your point person for reinvestment, repayment, upcoming deal flow, etc.

In no way does this change your current investment risk or payback period but I just wanted to alert you that I will be slowly reducing my role as a partner within the firm.  I will still be on most communication, will still be available for any questions and will still be involved but it will be in a heavily reduced role going forward.

I am still personally heavily invested with JJMT thru December 2018 and will be on the look out for your best interests/monitor our fiduciary responsibilities but myself and the other partners felt it was best to slowly wind down my involvement.

I wanted to let you know as soon as possible of this new development – as I said it shouldn't substantially change your investment risks, etc  - but if you want to talk further about why I am leaving JJMT I can make myself available for a phone call at anytime or would love to catch up over a drink.

Thanks,
Tyler

--


--

**Tyler Crookston, CFA**

Managing Partner, JJMT Capital LLC
tcrookston@jjmtcap.com
P: 630.707.1985

FILED DATE: 10/15/2021 7:53 AM  2021L010149

FILED DATE: 10/15/2021 7:53 AM  2021L010149

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| MICHAEL GOULD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2021 L |
| | ) | |
| TYLER CROOKSTON, | ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT "C"

FILED DATE: 10/15/2021 7:53 AM   2021L010149


CFA Institute

# CODE OF ETHICS AND STANDARDS OF PROFESSIONAL CONDUCT

## PREAMBLE

The CFA Institute Code of Ethics and Standards of Professional Conduct are fundamental to the values of CFA Institute and essential to achieving its mission to lead the investment profession globally by promoting the highest standards of ethics, education, and professional excellence for the ultimate benefit of society. High ethical standards are critical to maintaining the public's trust in financial markets and in the investment profession. Since their creation in the 1960s, the Code and Standards have promoted the integrity of CFA Institute members and served as a model for measuring the ethics of investment professionals globally, regardless of job function, cultural differences, or local laws and regulations. All CFA Institute members (including holders of the Chartered Financial Analyst® [CFA®] designation) and CFA candidates must abide by the Code and Standards and are encouraged to notify their employer of this responsibility. Violations may result in disciplinary sanctions by CFA Institute. Sanctions can include revocation of membership, revocation of candidacy in the CFA Program, and revocation of the right to use the CFA designation.

## THE CODE OF ETHICS

Members of CFA Institute (including CFA charterholders) and candidates for the CFA designation ("Members and Candidates") must:

- Act with integrity, competence, diligence, respect and in an ethical manner with the public, clients, prospective clients, employers, employees, colleagues in the investment profession, and other participants in the global capital markets.
- Place the integrity of the investment profession and the interests of clients above their own personal interests.
- Use reasonable care and exercise independent professional judgment when conducting investment analysis, making investment recommendations, taking investment actions, and engaging in other professional activities.
- Practice and encourage others to practice in a professional and ethical manner that will reflect credit on themselves and the profession.
- Promote the integrity and viability of the global capital markets for the ultimate benefit of society.
- Maintain and improve their professional competence and strive to maintain and improve the competence of other investment professionals.

## STANDARDS OF PROFESSIONAL CONDUCT

**I. PROFESSIONALISM**

**A. Knowledge of the Law.** Members and Candidates must understand and comply with all applicable laws, rules, and regulations (including the CFA Institute Code of Ethics and Standards of Professional Conduct) of any government, regulatory organization, licensing agency, or professional association governing their professional activities. In the event of conflict, Members and Candidates must comply with the more strict law, rule, or regulation. Members and Candidates must not knowingly participate or assist in and must dissociate from any violation of such laws, rules, or regulations.

**B. Independence and Objectivity.** Members and Candidates must use reasonable care and judgment to achieve and maintain independence and objectivity in their professional activities. Members and Candidates must not offer, solicit, or accept any gift, benefit, compensation, or consideration that reasonably could be expected to compromise their own or another's independence and objectivity.

**C. Misrepresentation.** Members and Candidates must not knowingly make any misrepresentations relating to investment analysis, recommendations, actions, or other professional activities.

**D. Misconduct.** Members and Candidates must not engage in any professional conduct involving dishonesty, fraud, or deceit or commit any act that reflects adversely on their professional reputation, integrity, or competence.

**II. INTEGRITY OF CAPITAL MARKETS**

**A. Material Nonpublic Information.** Members and Candidates who possess material nonpublic information that could affect the value of an investment must not act or cause others to act on the information.

**B. Market Manipulation.** Members and Candidates must not engage in practices that distort prices or artificially inflate trading volume with the intent to mislead market participants.

© 2014 CFA Institute

FILED DATE: 10/15/2021 7:53 AM    2021L010149

### III. DUTIES TO CLIENTS

**A. Loyalty, Prudence, and Care.** Members and Candidates have a duty of loyalty to their clients and must act with reasonable care and exercise prudent judgment. Members and Candidates must act for the benefit of their clients and place their clients' interests before their employer's or their own interests.

**B. Fair Dealing.** Members and Candidates must deal fairly and objectively with all clients when providing investment analysis, making investment recommendations, taking investment action, or engaging in other professional activities.

**C. Suitability.**

   **1.** When Members and Candidates are in an advisory relationship with a client, they must:

      **a.** Make a reasonable inquiry into a client's or prospective client's investment experience, risk and return objectives, and financial constraints prior to making any investment recommendation or taking investment action and must reassess and update this information regularly.

      **b.** Determine that an investment is suitable to the client's financial situation and consistent with the client's written objectives, mandates, and constraints before making an investment recommendation or taking investment action.

      **c.** Judge the suitability of investments in the context of the client's total portfolio.

   **2.** When Members and Candidates are responsible for managing a portfolio to a specific mandate, strategy, or style, they must make only investment recommendations or take only investment actions that are consistent with the stated objectives and constraints of the portfolio.

**D. Performance Presentation.** When communicating investment performance information, Members and Candidates must make reasonable efforts to ensure that it is fair, accurate, and complete.

**E. Preservation of Confidentiality.** Members and Candidates must keep information about current, former, and prospective clients confidential unless:

   **1.** The information concerns illegal activities on the part of the client or prospective client,

   **2.** Disclosure is required by law, or

   **3.** The client or prospective client permits disclosure of the information.

### IV. DUTIES TO EMPLOYERS

**A. Loyalty.** In matters related to their employment, Members and Candidates must act for the benefit of their employer and not deprive their employer of the advantage of their skills and abilities, divulge confidential information, or otherwise cause harm to their employer.

**B. Additional Compensation Arrangements.** Members and Candidates must not accept gifts, benefits, compensation, or consideration that competes with or might reasonably be expected to create a conflict of interest with their employer's interest unless they obtain written consent from all parties involved.

**C. Responsibilities of Supervisors.** Members and Candidates must make reasonable efforts to ensure that anyone subject to their supervision or authority complies with applicable laws, rules, regulations, and the Code and Standards.

### V. INVESTMENT ANALYSIS, RECOMMENDATIONS, AND ACTIONS

**A. Diligence and Reasonable Basis.** Members and Candidates must:

   **1.** Exercise diligence, independence, and thoroughness in analyzing investments, making investment recommendations, and taking investment actions.

   **2.** Have a reasonable and adequate basis, supported by appropriate research and investigation, for any investment analysis, recommendation, or action.

**B. Communication with Clients and Prospective Clients.** Members and Candidates must:

   **1.** Disclose to clients and prospective clients the basic format and general principles of the investment processes they use to analyze investments, select securities, and construct portfolios and must promptly disclose any changes that might materially affect those processes.

   **2.** Disclose to clients and prospective clients significant limitations and risks associated with the investment process.

   **3.** Use reasonable judgment in identifying which factors are important to their investment analyses, recommendations, or actions and include those factors in communications with clients and prospective clients.

   **4.** Distinguish between fact and opinion in the presentation of investment analysis and recommendations.

**C. Record Retention.** Members and Candidates must develop and maintain appropriate records to support their investment analyses, recommendations, actions, and other investment-related communications with clients and prospective clients.

### VI. CONFLICTS OF INTEREST

**A. Disclosure of Conflicts.** Members and Candidates must make full and fair disclosure of all matters that could reasonably be expected to impair their independence and objectivity or interfere with respective duties to their clients, prospective clients, and employer. Members and Candidates must ensure that such disclosures are prominent, are delivered in plain language, and communicate the relevant information effectively.

**B. Priority of Transactions.** Investment transactions for clients and employers must have priority over investment transactions in which a Member or Candidate is the beneficial owner.

**C. Referral Fees.** Members and Candidates must disclose to their employer, clients, and prospective clients, as appropriate, any compensation, consideration, or benefit received from or paid to others for the recommendation of products or services.

### VII. RESPONSIBILITIES AS A CFA INSTITUTE MEMBER OR CFA CANDIDATE

**A. Conduct as Participants in CFA Institute Programs.** Members and Candidates must not engage in any conduct that compromises the reputation or integrity of CFA Institute or the CFA designation or the integrity, validity, or security of the CFA Institute programs.

**B. Reference to CFA Institute, the CFA Designation, and the CFA Program.** When referring to CFA Institute, CFA Institute membership, the CFA designation, or candidacy in the CFA Program, Members and Candidates must not misrepresent or exaggerate the meaning or implications of membership in CFA Institute, holding the CFA designation, or candidacy in the CFA program.



Notice and Acknowledgment of
Receipt of Summons and Complaint                    (12/01/20) CCG 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MICHAEL GOULD

_____
                    Plaintiff(s)        Case No. _____
                                        2021 L 010149
           vs.

TYLER CROOKSTON                         Defendant(s)
_____        Amount Claimed:   $ _____
                    Defendant(s)

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

To: ___Tyler Crookston_____   Address: __c/o Ellen Wheeler, 321 N. Clark, #3000__
         (Name)

City: ___Chicago_____   State: __IL___ Zip: __60654___

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within _____ * days.
                                                   30

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within _____ * days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.
                                                   30

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within _____ ** days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.
                                         60

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _10/19/21_____ .

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 2

Notice and Acknowledgment of
Receipt of Summons and Complaint                    (12/01/20) CCG 0063 B

E-filing is now mandatory for documents in civil cases with limited exemptions.  To
e-file, you must first create an account with an e-filing service provider.  Visit http://efile.
illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.  If
you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/
gethelp.asp.

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in
the above captioned matter at:

(Please print or type)
Name: _Margaret Gambala Nelson_

Address: _321 N. Clark St., Ste 3000_

City: _Chicago_          State: _IL_   Zip: _60654_

Email: _mnelson @ foley. com_

Relationship to Entity/Authority to Receive Service of Process: _attorney_
(Not applicable if your are the named Defendant or Respondent.)

Dated: _10/19/2021_

_Margaret G. Nelson_
Signature

\*    (To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date
     on which the request is sent, or 60 days if the defendant is addressed outside the United States.

\*\*   (To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the
     date on which the request is sent, or 90 days if the defendant is addressed outside the United States.